## GEORGE R. MAYNE· *v.* THE STEAMSHIP MAKURA.

### August 3, 1912.

1.. *Admiralty—Jurisdiction in rem—Breach of contract of carriage:* A suit *in rem* is not maintainable for breach of an executory contract to carry a passenger on a particular vessel, where the vessel has never entered upon the performance thereof, even though there has been full prepayment of fare..

2. *Same—Lien:* A lien in admiralty cannot, as a general rule at least, attach to a vessel other than the one involved in the breach of contract or other wrongful act which is the basis of the claim.

3. *Principal and agent—Pleading—Joinder of principal and agent as defendants:* One who contracts with a disclosed principal through the latter's agent, has no right of action against the agent for breach of the agreement, and it is improper to join the agent as a party defendant in an action against the principal on such agreement.

4. *Pleading—Damages—Breach of contract—Expected profits:* An objection to an alleged claim of damages as "largely composed of loss of expected profits," overruled.

5. *Same—Argumentative or inferential allegations:* Allegations of ownership of the *res* in a libel *in rem* should be direct and not by way of inference.

6. *Same—Amendment—Joinder of actions in rem and in personam:* The libelant having brought his action substantially *in rem* and *in personam*, the action *in rem* having been held to be unfounded, and the respondents having withdrawn an exception to such joinder, the court allows the libelant by amendment to proceed *in personam*.

*In Admiralty:* Exceptions to libel.

*Lorrin Andrews* and *George A. Davis,* for libelant.
*Holmes, Stanley & Olson* for libellees.

CLEMONS, J. To this libel in a cause of contract, civil and maritime, against the steamship Makura and her appurtenances, and the Union Steamship Company of New Zealand, Limited, her owner, and the Canadian-Australian

Royal Mail Steamship Line, there have been interposed in behalf of the libellees, the Union Steamship Company and the Canadian-Australian Royal Mail Steamship line, and the master of the steamship Makura, as claimant the exceptions hereinafter set forth.

The libel alleges the following facts: The libelant, on February 1, 1911, had entered into a contract with three actors to perform at such places as the libelant should designate, for which they were to receive fifteen hundred dollars per month, costs of transportation and reasonable expenses, the contract to continue for two years from that date. The Union Steamship Company was then and at the time of filing the libel agent for the Canadian-Australian Line and owned and operated a line of steamships plying between New Zealand and Australia on the one hand and Vancouver and San Francisco on the other, and calling at Fiji and elsewhere. The Union Steamship Company was a common carrier of passengers and as such carrier and, in the language of the libel, "acting for the Canadian-Australian Line", and upon applicantion of the libelant, entered into a contract for hire to carry and convey these three actors from Suva, Fiji, to Honolulu, Hawaii, at which port the steamships of the Union Steamship Company and the Canadian-Australian Line touched and to which these ships conveyed passengers; and pursuant to said contract the libelant paid to the Canadian-Australian Line three hundred dollars as passage money for the transportation of these actors from Suva to Honolulu, which money was received and is held by the Union Steamship Company under and by virtue of said agreement, and the Union Steamship Company, by this contract, agreed to carry these actors from Suva to Honolulu on one of its steamships, the Moana, which was scheduled to sail and did sail from Suva to Honolulu, on or about February 14, 1911. This steamship had ample accomodation and room for the transportation and conveyance of the said actors, when she arrived at Suva at that time and on

her departure thereafter. But the Union Steamship Company in violation of its contract and of its duty as a common carrier of passengers for hire, and without just cause or excuse, refused to receive these actors on board of the steamship Moana and to carry them to Honolulu, although they presented themselves for conveyance as passengers aforesaid and in a fit and proper state and at a reasonable time before the departure of the vessel, had complied with every reasonable rule and regulation in that behalf, and were fit and proper persons to be carried as such passengers, and although the libelant was ready and willing on said February 1, 1911, to pay to the agents of the Union Steamship Company any further sums of money or reasonable charges which the Union Steamship Company or its agents might require for the carriage of these passengers. By reason of the breaches of contract, the libelant was deprived of the services of the actors, was unable to fulfill his engagements and contracts which he had entered into with divers persons to give public performances in Honolulu after the arrival of the steamship Moana sailing from Suva as aforesaid, and "lost large sums of money which he would have obtained from the sale of tickets for such performances and otherwise," and also "became liable for the salaries" of the said actors at the rate of fifteen hundred dollars per month, and was forced and required to expend a large sum of money for expenses, telegrams, and other charges; for which he claims damages of fifteen thousand dollars.

It is then alleged that the steamship Makura, theretofore described by inference and not directly as owned by the Union Steamship Company, was, at the date of the libel, lying in the port of Honolulu and would on that day proceed to sea and out of the jurisdiction of this court, and that the said company "has no property or assets" within this jurisdiction "other than the said steamship Makura."

The Union Steamship Company is described throughout

as a corporation, but no suggestion is made anywhere in the libel as to the status of the Canadian-Australian Line.

The libel concludes with a prayer for process against the steamship Moana, with citation of the libellee companies and all claiming interest in the said vessel, to appear and answer, and for return of the passage money and payment of the said damages, and for condemnation and sale of the said steamship to satisfy the libelant's demands. By the court's order, process issued as prayed. The vessel was seized by the marshal and by stipulation of the proctors for the libelant released under bond, and the respondents Union Steamship Company and Canadian-Australian Line were, as this court has heretofore held, duly served (*Mayne* v. *The Makura*, ante, p. 39) through their agents in charge of their business and office at Honolulu.

The objection common to both exceptions, "That two causes of action are improperly joined in said libel, to-wit: a claim *in personam* and a claim *in rem*," was withdrawn at the time of the oral argument. The other exceptions of the libellee companies are the same as those of the claimant master, save that the latter includes an exception, "that the allegations * * * do not disclose any admiralty claim or lien upon the said steamship Makura," and that the former urge: "that there is a misjoinder of party libellees," and "that the said libel is ambiguous, unintelligible and uncertain in that it does not appear therefrom that these libellees, or either of them, are under any liability to the libelant."

[1] As to the exception of the master, claimant, founded on the non-disclosure of an admiralty or maritime lien upon the ship Makura: The contention in this behalf is, that this is a proceeding *in rem* and as such must fail because the esential, basic, lien is wanting. In reply, the libellant cites the ruling in *The Stanley Dollar*, 2 U. S. Dist. Ct. Haw., 337, 342 (see, also, 160 Fed. 914), supported by Benedict on Admiralty, 3rd ed.; sec. 286, holding a ship to

be liable *in rem* "if the ship, her masters and owners, do not faithfully and fully perform their contracts to carry goods or passengers." But, the libellees argue, the ruling in the case of *The Stanley Dollar* does not apply to the present case, for the reason that the contract here remained executory on the part of the carrier, as in the case of *The Eugene,* 83 Fed. 222, in which it was held that even pre-payment of the passenger fare made no difference in favor of a lien, when the vessel herself had not entered upon performance, or, in other words, that the lien does not attach until the passenger has placed himself within the care and under the control of the master. This particular ruling was affirmed on appeal, *The Eugene,* 87 Fed. 1001, 1003, and adhered to by the lower court in the later case of *The Bella,* 91 Fed. 540, 542. To the decisions reviewed in *The Eugene,* 83 Fed. 222, there may be added *The Missouri,* 30 Fed. 384.

The considerable study which I have given to the point raised in the case of *The Eugene* has convinced me that the decision in that case is well founded. The only question suggested which caused hesitation in accepting that decision as final, was this: If, in the carriage of goods, the remedy against the ship is the reciprocal of the ship's right of recourse against the goods (*The Schooner Freeman v. Buckingham,* 18 How. 182, 188; *Vandewater v. Mills,* 19 How. 82, 89-90; *The Rebecca,* 1 Ware, 187, 20 Fed. Cas. 373, 374-375, No. 11,619), and if in a contract of carriage of passengers, the passage money is the equivalent of freight (The *Aberfoyle,* 1 Blatch. 360, 1 Fed. Cas. 35, No. 17, s. c. Abb. Adm. 242, 1 Fed. Cas. 30, No. 16; *The Moses Taylor,* 4 Wall. 411, 427. And see *The Pacific,* 1 Blatch. 569, 18 Fed. Cas. 935, 942, No. 10,643), why should not the remedy *in rem* be allowed against the ship when the carrier has, instead of mere security for her compensation, the actual payment of that compensation in advance? But the question must be answered in the negative, for others have interests just as worthy of consideration as the interests of the

man who has parted with his money in the prepayment of freight or of passenger-fare:

"The maritime 'privilege' or lien is adopted from the civil law, and imports a tacit hypothecation of the subject of it. It is a '*jus in re*,' without actual possession or any right of possession. It accompanies the property into the hands of a bona fide purchaser. It can be executed and divested only by a proceeding *in rem*. This sort of proceeding against personal property is unknown to the common law, and is peculiar to the process of courts of admiralty. The foreign and other attachments of property in the State courts, though by analogy loosely termed proceedings *in rem,* are evidently not within the category. But this privilege or lien, though adhering to the vessel, is a secret one; it may operate to the prejudice of general creditors and purchasers without notice; it is therefore '*stricti juris*,' and cannot be extended by construction, analogy, or inference. 'Analogy,' says Pardessus, (Droit Civ., vol. 3, 597) 'cannot afford a decisive argument, because privileges are of *strict right*. They are an exception to the rule by which all creditors have equal rights in the property of their debtor, and an exception should be declared and described in express words; we cannot arrive at it by reasoning from one case to another.'" *Vandewater v. Mills* (*The Yankee Blade*), 19 How. 82, 89. See, also, *The Larch,* 2 Curtis, 427; 14 Fed. Cas. 1139, 1141, No. 8,085.

To create a lien for mere money-loss would be to create a lien in very nearly every case. Such an extraordinary remedy should not be weakened by being made universal, but should best be reserved for extraordinary contingencies.

The authorities offer no suggestion that any protection against mere money-loss was in view in giving a lien to the shipper of goods or to the passenger, for any loss of money paid in advance for carriage must always be small in comparison with the value of the object to be carried; indeed, in the case of a passenger, there is no comparison between the fare and the value of a human life. It is, rather, the safe-carriage, the general safety, of the object itself, while more or less at the mercy of the carrier, whether that object

be a person or a thing, which seems to be the concern of the law in giving the lien against the ship. Wherefore, it is held to be of so great importance that the object of carriage must come within the care and custody of the carrier before this extraordinary lien attaches.

[2]    The exception is well taken. But, in any event, it may be upheld, also, by the fact that the case presents a claim against a ship other than that to which the contract of carriage applied—a ship other than the one on which passage was engaged. It is fundamental that no maritime lien can attach to any object except the offending thing, or the thing in default, itself: at least such seems to be the general rule, and nothing has been suggested or discovered to make the present case an exception. See *The Pacific,* 1 Blatch. 569, 18 Fed. Cas. 935, 942, No. 10,643; Holmes, Com. Law, 25-29. In the early days of the Hawaiian judiciary, the learned Chief Justice Lee had occasion to say on this very point, in the course of a decision in admiralty. "Now, clearly the plaintiff had no lien on the 'Nile' for supplies furnished to the 'Walter Claxton' ": *Spencer v. Bailey,* 1 Haw. 187 (\*108); and also, "The 'Nile' is not attached for any 'maritime lien or liability' attaching to that *particular vessel,* but is seized like any other property of the defendants, under a process *in personam.*" Id. 193 (\*112). See, also, Id., 192 (\*111).

[3a]    The exception of misjoinder of party libellees is well taken. This proceeding makes parties respondent both the principal, Canadian-Australian Line, and the agent, Union Steamship Company, which is also owner of the steamship Makura. The only instance known to the court in which, under any authority, both principal and agent may be sued together for breach of contract, is where the agent acted ostensibly as principal but really as agent for a principal undisclosed. See 31 Cyc. 1624 and cases cited. Even the soundness of such authority may be questionable (see *Tuthill v. Wilson,* 90 N. Y. 423), but it is beyond ques-

tion, that one who contracts with a known principal through an authorized agent, has no right of action against the agent, and no right of action against any one but the principal or his privies. The exception is well taken, as is also the allied exception of want of showing of any liability of the respondent Union Steamship Company: for it was a disclosed agent contracting only for and in the name of a disclosed principal. But the exception of want of showing of any liability of the respondent principal, is untenable.

The exception of ambiguity, unintelligibility and uncertainty, in that it does not appear who were the parties to the alleged contract of February 1, 1911, is not without excuse, for the allegations of the libel are wanting in simplicity and clearness. But they are capable of being understood, and can be understood only as stating a contract between the libelant and the Canadian-Australian Line (presumably a corporation, though this is not alleged) through its agent the Union Steamship Company.

[5]  The exception, that it does not appear that the steamship Makura was the property of any person or persons legally liable under the alleged contract, is well taken: for the sake of good pleading. There is nowhere a distinct allegation of ownership. The nearest approach to it is mere inference, suggestion of ownership. The libelant leaves ownership to be discovered only from the introductory paragraph of the libel naming the parties respondent as "the steamship Makura * * * and the Union Steamship Company * * * owner of the said steamship," from a mere descriptive phrase in the body of the libel, "The Union Steamship Company * * * owner of the said steamship," and from the indirect allegation that the Union Steamship Company "has no other property or assets within the jurisdiction * * * other than the said steamship." In view of the adverse ruling on the question of lien, the question of ownership is ·not vital, but the court takes occasion to

emphasize its disapproval of argumentative pleading, or pleading by inference.

[4]   The objection to the claim of damages as "largely composed of loss of expected profits" which are not "recoverable in this proceeding", is directed to an allegation that the libelant by reason of the breach of contract was "deprived of large sums of money which he would have obtained from the sale of tickets for such performances" of these three actors, also possibly directed to the allegation of liability for salaries of the actors and expenses, including telegrams and other items, incurred by reason of the failure of the carrier to transport these "intending passengers". The line between lost profits which may be shown in evidence as a basis of damages and those which may not be shown, is so difficult to draw, that the court is not inclined to narrow the libelant's line of proof of damages in advance of the trial, though it might require more particularity of allegations of special damages if the objection had been made on that ground.   The not dissimilar case of *Foster v. Cleveland &c. Ry. Co.,* 56 Fed. 434, is suggestive of the proper limits of proof as to engagements of actors, interfered with by fault of a common carrier.   See, also, 3 Sutherland, Damages, 3rd ed., sec. 947; 13 Cyc. 179.

[3b]   The exception, that the libel "does not set forth any good cause of action against either of these libellees, or any matter or thing whereon any decree against either of these libellees can be made or granted," must be sustained as to the agent libellee but overruled as to the libellee principal, the Canadian-Australian Line, for reasons which are disclosed in the discussion of principles of agency.

[6]   Let the libel be dismissed as against the steamship Makura and her appurtenances, and the bond given upon her release be canceled.   The ruling on the point of agency justifies the immediate dismissal of the libel as against the Union Steamship Company, but on counsel's confession, in the course of oral argument, of a possible confusion of prin-

cipal and agent in the allegations of the libel, the court will not now order such dismissal, but grants the libelant five days within which to amend to cover any error in that regard; unless such amendment, verified, and approved by the court, is filed within that time, the libel will be dismissed as against the Union Steamship Company. The objection having been waived, as to joinder of an action *in rem* with one *in personam*, and there appearing from the libel a clear right of recovery against the person, the libelant may proceed *in personam* upon amending his libel in accordance with this opinion. See *The Monte A*, 12 Fed. 331, 337, 338; Betts, Adm. Pr. 99, as quoted in 12 Fed. 337.